## UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

KEVIN M. CALLAHAN,
    *Plaintiff*,

    v.

JEFFRY WISDOM, H.E. WISDOM &
SONS, INC. D/B/A WISDOM
ADHESIVES WORLDWIDE,
    *Defendants.*

No. 3:19-CV-00350 (KAD)

April 29, 2020

### MEMORANDUM OF DECISION RE:
### DEFENDANTS' MOTION TO DISMISS (ECF NO. 33)

Kari A. Dooley, United States District Judge:

Pending before the Court is the renewed motion of Defendants Jeffry Wisdom ("Wisdom") and H.E. Wisdom & Sons, Inc. d/b/a Wisdom Adhesives Worldwide ("Wisdom & Sons," or the "Company," and, collectively, the "Defendants") to dismiss this action pursuant to Fed. R. Civ. P. 12(b)(2) and (b)(3) for lack of personal jurisdiction and improper venue. (ECF No. 33.) On August 15, 2019, the District Court (Eginton, *J*.) denied Defendants' initial motion to dismiss without prejudice and permitted the parties a brief period of discovery into the jurisdictional issues that formed the basis of the Defendants' motion. (The "Ruling," ECF No. 23.) The parties have since completed that jurisdictional discovery and the Defendants have moved again for dismissal. In opposition, Plaintiff Kevin M. Callahan ("Callahan") maintains that there is an adequate basis for this Court to exercise personal jurisdiction over both Defendants and that venue is proper in the District of Connecticut. (ECF No. 34.) Defendants filed a reply brief (ECF No. 35) and the Court held oral argument on March 2, 2020. (ECF No. 54.) For the reasons that follow, Defendants'

motion to dismiss for lack of personal jurisdiction is GRANTED and the case is transferred to the

United States District Court for the Northern District of Illinois pursuant to 28 U.S.C. § 1406(a).

**Background**

Callahan is an entrepreneur and management consultant who resides in Connecticut.

(Compl. ¶¶ 1, 8, ECF No. 1.)  Callahan and Wisdom grew up together in Illinois, where Wisdom

continues to reside, and the two remained close friends for many years.  (*Id.* ¶¶ 9, 11.)  Since the

1990s Wisdom has served as President of Wisdom & Sons, which is an Illinois corporation with

its principal place of business in Elgin, Illinois.  (*Id.* ¶¶ 10, 12.)  The Company manufactures and

sells adhesive products for industrial use.  (*Id.* ¶ 1.)

Prior to 1997 Callahan served as a management consultant at McKinsey and Company,

which he left to pursue entrepreneurial ventures.  (*Id.* ¶ 13.)  Over the years and during the course

of their friendship Callahan intermittently provided business services to Wisdom & Sons, though

the parties disagree about the significance of these endeavors.  Callahan describes his work as

sought-after contributions to the Company while Wisdom characterizes these engagements as

"gesture[s] of charity" that he provided to help ameliorate Callahan's financial struggles.  (*See,

e.g.*, Wisdom Aff. ¶ 3, ECF No. 33-2.)  For example, the parties agree that in 1991 Callahan created

a marketing brochure for the Company for which he was paid a de minimis amount of

approximately $1,000.  (Compl. ¶ 14; Wisdom Aff. ¶ 4.)  They also agree that sometime around

2010 Callahan researched and wrote a 75-page history of the Company for which he was paid

$10,000, though Wisdom claims the "work was not the book we originally sought."  (Compl. ¶ 16;

Wisdom Aff. ¶ 6.)  Callahan further alleges that he developed a detailed business plan for the

Company at Wisdom's request in 2003 (Compl. ¶ 15), while Wisdom claims that it was Callahan

who approached him "with a profit pyramid business model that he developed," which Wisdom only entertained "out of friendship" but "never used or implemented."  (Wisdom Aff. ¶ 5.)

According to Callahan, in the summer of 2013, Tom Rolando ("Rolando"), the Company's Chief Operating and Technical Officer, reached out to Callahan about establishing a new company to be called Praetor Adhesives, which Wisdom conceived as part of a plan for increasing industry competition in an effort to grow the Company and enable its acquisition.  (Compl. ¶ 18.)  Callahan alleges that Wisdom proposed that Praetor Adhesives would be controlled by Callahan and funded by the Company.  (*Id.*)  While these discussions were underway, Callahan alleges that in the fall of 2013, Wisdom asked Callahan to work on developing the Company's global business, which at the time, had annual revenues of approximately $700,000, but the revenues had plateaued.  (*Id.* ¶ 19.)  Wisdom, however, claims that he only offered this opportunity to Callahan as an alternative to lending him money after taking pity on Callahan for his financial difficulties.  (Wisdom Aff. ¶ 7.)  He states that he also gave Callahan certain existing Company accounts in Europe and Asia to service as a means of reducing his own international travel.  (*Id.* ¶ 8.)  Whatever the genesis of the arrangement, Callahan understood the purpose of his role to be to win business from competitors as part of Wisdom's strategy of increasing the Company's attractiveness as a potential acquisition. (Compl. ¶ 20.)

Callahan was appointed Vice Chairman and head of the Company's global adhesives business, for which he was  initially compensated $20,000 per month.  (*Id.* ¶ 21.)  Wisdom declined to enter into a written contract with Callahan, "[c]iting his aversion to written contracts."  (*Id.* ¶ 22.)  Callahan was regarded as an independent contractor consultant and his compensation was remitted via checks made out to Callahan's company, Playbook Group LLC, which were mailed to Callahan's Connecticut residence.  (*Id.* ¶ 23.)  Wisdom did not know at the time that Playbook

Group is a Connecticut LLC.  (Wisdom Aff. ¶ 16.)  During the course of his performance Callahan undertook several international business trips to meet with prospective customers and global partners.  (Compl. ¶¶ 25–27, 38–39, 45–46.)  He also traveled to Elgin, Illinois, the site of the Company's headquarters, on approximately 15 different occasions between November 2013 and January 2017.  (*See* Pl.'s Interrog. Resp. Nos. 4, 14, ECF No. 33-4.)  Wisdom, by contrast, never met with Callahan in Connecticut in connection with Callahan's services for the Company.  (*See* Pl.'s Interrog. Resp. No. 5.)  Outside of the overseas and Illinois business trips, Callahan principally performed his obligations to the Company from his Connecticut home (Compl. ¶ 23), though this was not required by the parties' arrangement.  (Wisdom Aff. ¶ 13.)

Callahan avers that "[t]hrough his skill, experience, and effort, Callahan developed relationships which generated multi-fold growth in Wisdom Adhesives' global business." (Compl. ¶ 24.)  By the end of 2014, one year after his appointment, Callahan alleges that the Company's revenues from the global business had increased from $700,000 to $1.8 million.  (*Id.* ¶ 29.)  Around this time Callahan alleges that he approached Wisdom about his desire to earn an equity stake in the Company as opposed to a fixed compensation and he claims that Wisdom responded favorably, instructing Callahan to come up with a model for performance-based compensation from the joint ventures Callahan was cultivating between the Company and foreign partners.  (*Id.* ¶¶ 30–32.)  Callahan followed up on these conversations by pursuing proposed joint ventures with two companies in particular—Nan Pao Resins Chemical Co. Ltd. ("Nan Pao") in Taiwan and Demcopack ("Demco") in Belgium—which allegedly "would include a partial interest for Callahan personally as a way of monetizing his interest in the global business for compensation purposes, as Wisdom had instructed."  (*Id.* ¶ 35.)  With Wisdom's alleged approval and input, Callahan undertook extensive efforts to generate and negotiate these joint ventures over the

ensuing months. (*Id.* ¶¶ 36–46.) In the meantime, around November 2015, Wisdom had asked Callahan if the Company could reduce his compensation to $10,000 per month in light of the fact that Callahan was dividing his time between the Company and a personal venture while allegedly reaffirming the parties' mutual intent to transition to a performance-based compensation model. (*Id.* ¶ 41.) Callahan agreed but in doing so alleges that he relied on Wisdom's representation "that the global business was 'his business'" and that he would eventually be compensated accordingly. (*Id.*) Wisdom, by contrast, asserts that he never told Callahan that the Company's "global business was his, whether to manage, run, possess, or for any other reason," and that he cut Callahan's compensation due to the fact that the Company "did not see the expected returns from Callahan's work" and "needed to see profitability" to justify his continued engagement. (Wisdom Aff. ¶¶ 10, 17, 19.)

Callahan alleges that he ultimately negotiated near-final agreements with Nan Pao and Demco by the summer of 2016. (Compl. ¶¶ 44–46.) When it came time to execute them, however, Callahan alleges that Wisdom demurred and ultimately failed to follow through. (*Id.* ¶¶ 47–48.) In October 2016 Callahan learned that Wisdom was in discussions with a competitor, H.B. Fuller, about a potential acquisition, though Callahan alleges that Wisdom assured him that he should continue moving forward with the proposed joint ventures, indicating that Callahan "would be compensated out of any sale of the Company." (*Id.* ¶ 51.) Based on these representations Callahan alleges that he continued to pursue global partnerships. (*Id.* ¶ 52.) Wisdom, by contrast, asserts that while he knew Callahan was working on joint deals, he "never provided, sold, contracted, or promised Callahan that he could take an equity stake in any joint venture formed with" the Company. (Wisdom Aff. ¶ 20.)

According to Callahan, the Company finished 2016 with $4.2 million in revenue from its global business, which reflected a 42% increase from the prior year.  (Compl. ¶ 50.)  On January 29, 2017, allegedly without prior warning to Callahan, Wisdom announced that the Company had been sold "to H.B. Fuller for $122 million in cash."  (*Id.* ¶ 53.)  Callahan's proposed joint venture agreements, which had not yet been consummated, died with the sale, causing Callahan to sacrifice those business relationships and his credibility with the global partners.  (*Id.* ¶ 54.)  Callahan attempted to follow up with Wisdom about the compensation that he claims that he was promised but Wisdom allegedly deflected his requests, indicating that the Fuller acquisition prevented him from making any payouts for a two-year period that ended in January 2019.  (*Id.* ¶¶ 57–58.)  After January of 2019, however, Wisdom still allegedly refused to compensate Callahan for his role in increasing global revenues.  (*Id.* ¶ 59.)  This lawsuit followed.

**Procedural History**

Callahan brings claims for breach of contract (Count One), promissory estoppel (Count Two), unjust enrichment (Count Three), and quantum meruit (Count Four) against both Defendants.  He asserts that he is entitled to $5 million in damages, which he calculates to be the portion of the $122 million purchase price that is attributable to his expansion of the Company's global business.  (*Id.* ¶ 56.)

Defendants first moved to dismiss this action on May 13, 2019 for lack of personal jurisdiction and improper venue.  (ECF No. 17.)  Construing the allegations in Callahan's favor pre-discovery, the District Court (Eginton, *J.*) concluded that Callahan had made a preliminary showing that the Court had jurisdiction over the Defendants under Connecticut's long-arm statutes.  Regarding Wisdom, the Court found that Callahan's claim that Wisdom contacted him in Connecticut to engage his consulting services "has at least stated a prima facie case that Mr.

Wisdom purposefully transacted business in Connecticut" within the meaning of Conn. Gen. Stat. § 52-59b(a)(1), while noting that it could not "assess the degree to which plaintiff conducted business from Connecticut."  (Ruling at 8–9.)  The Court therefore permitted "a brief period of jurisdictional discovery to determine the nature and extent of the business transactions in Connecticut."  (*Id.* at 9.)

With respect to the Company, the Court likewise concluded that Callahan had "stated a prima facie case that defendant Wisdom agreed to [Callahan's] proposed equity stake" so as to satisfy Conn. Gen. Stat. § 33-929(f)(1), which subjects a foreign corporation to jurisdiction in Connecticut "on any cause of action arising . . . [o]ut of any contract made in this state or to be performed in this state."  (Ruling at 9–10.)  The Court further found that Callahan had stated a threshold case that the action arose out of business the Company "solicited" in Connecticut and that it was therefore reasonably foreseeable that the Company could be sued in Connecticut, consistent with the standard set forth in Conn. Gen. Stat. § 33-929(f)(2).  (*Id.* at 10–11.)  The Court again allowed the parties a period of brief jurisdictional "discovery to determine the nature and extent of the alleged solicitation of business in Connecticut."  (*Id.* at 11.)  As for the constitutional requirement, the Court held that the Court lacked general personal jurisdiction over either Defendant but observed that the question of specific jurisdiction, which turned on the same issues germane to those raised by the long-arm statutes, should be reconsidered after the completion of jurisdictional discovery.  (*Id.* at 13.)  The Court further held that the question of improper venue should be resolved after such discovery, which the Court ordered completed by October 4, 2019, and permitted Defendants to thereafter file a renewed motion to dismiss.  (*Id.* at 14.)

After the period of jurisdictional discovery was extended to November 4, 2019 (ECF No. 25) the case was reassigned to this Court for further proceedings (ECF No. 26) and the parties renewed their briefing with respect to the Defendants' motion.

**Standard of Review**

"A plaintiff bears the burden of showing that the court has personal jurisdiction over each defendant." *Carney v. Beracha*, 996 F. Supp. 2d 56, 60 (D. Conn. 2014). "[H]owever, the showing a plaintiff must make to defeat a defendant's claim that the court lacks personal jurisdiction over it 'varies depending on the procedural posture of the litigation.'" *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (*per curiam*) (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)).

> Prior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith, legally sufficient allegations of jurisdiction. At that preliminary stage, the plaintiff's *prima facie* showing may be established solely by allegations. After discovery, the plaintiff's *prima facie* showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant. At that point, the *prima facie* showing must be factually supported.

*Id.* at 84–85 (quoting *Ball*, 902 F.2d at 197).[1]   Accordingly, Callahan's assertion of personal jurisdiction over the Defendants must be factually supported.

**Discussion**

"[P]ersonal jurisdiction is determined by the law of the state in which the district court sits." *Doe v. Ciolli*, 611 F. Supp. 2d 216, 220 (D. Conn. 2009). "The first inquiry must be whether [Connecticut's] long-arm statute authorizes the exercise of jurisdiction under the particular facts

---

[1] If, however, the Court determines that "the jurisdictional dispute is interwoven with the underlying merits of [the plaintiff's] suit," then the "Court must leave the jurisdictional issue for the trial," though it "may also deem it appropriate to make a preliminary finding on jurisdictional facts, subject to revision later in the proceedings or at trial." *Id.* at 87 (quoting *Alliance for Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 88 (2d Cir. 2006)). Here, the Court is able to resolve the jurisdictional dispute without reaching the merits of Callahan's claims and so this standard is inapplicable.

of this case. Only if [the Court] find[s] the statute to be applicable do[es it] reach the question whether it would offend due process to assert jurisdiction." *West World Media, LLC v. Ikamobile Ltd.*, 809 F. Supp. 2d 26, 30 (D. Conn. 2011) (quoting *Lombard Bros., Inc. v. Gen. Asset Mgmt. Co.*, 190 Conn. 245, 250, 460 A.2d 481 (1983) (brackets omitted)).

### Long-Arm Jurisdiction - Wisdom

Connecticut's long-arm statute permits a court to, *inter alia*, "exercise personal jurisdiction over any nonresident individual . . . who in person or through an agent . . . [t]ransacts any business within the state." Conn. Gen. Stat. § 52-59b(a)(1). Callahan relies only upon subsection (a)(1) of the statute.[2]

"The term 'transacting business,' as used in § 52–59b(a)(1), is not broadly interpreted in Connecticut." *Vertrue Inc. v. Meshkin*, 429 F. Supp. 2d 479, 489–90 (D. Conn. 2006) (internal quotation marks and citation omitted). "A 'nonresident individual who has not entered this state physically nevertheless may be subject to jurisdiction in this state under § 52–59b(a)(1) if that individual has 'invoked the benefits and protection of Connecticut's laws' by virtue of his or her 'purposeful Connecticut related activity.'" *Kaufman LLC v. Feinberg*, No. 3:17-CV-958 (VAB), 2020 WL 509765, at *9 (D. Conn. Jan. 31, 2020) (quoting *Ryan v. Cerullo*, 282 Conn. 109, 120, 918 A.2d 867 (2007)). "[A] single purposeful business transaction" can fall within the ambit of "transacts any business." *See Ryan*, 282 Conn. at 119 (quotation marks and citations omitted).

---

[2] The long-arm statute also permits the exercise of personal jurisdiction over a nonresident individual who: "(2) commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; (3) commits a tortious act outside the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if such person or agent (A) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (B) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; (4) owns, uses or possesses any real property situated within the state; or (5) uses a computer, as defined in subdivision (1) of subsection (a) of section 53-451, or a computer network, as defined in subdivision (3) of subsection (a) of said section, located within the state." Conn. Gen. Stat. § 52-59b(a).

Courts must "examine the nature and quality, rather than the amount of Connecticut contacts to determine whether there was purposeful activity." *Confectionary Arts Int'l, LLC v. CK Prod. LLC*, No. 3:16-CV-2015 (JBA), 2018 WL 1141357, at *4 (D. Conn. Mar. 1, 2018) (quotation marks and citation omitted).

Generally, "the transmission of communications between a non-resident defendant and a party within the jurisdiction does not, by itself, constitute the transaction of business in this state." *Vitale v. Catanese*, No. 3:11-CV-1831 (MPS), 2013 WL 3992394, at *3 (D. Conn. Aug. 2, 2013) (citing cases). So too is "the negotiation or existence of a contract, standing alone, . . . insufficient to exercise personal jurisdiction over a defendant." *HSQD, LLC v. Morinville*, No. 3:11-CV-1225 (WWE) 2012 WL 2088698, at *3 (D. Conn. June 8, 2012). "However, the existence of a contract along with substantial telephone and email communications related to the contractual relationship can be sufficient to constitute transaction of business in the forum state." *Id.* (citing *Caplan v. Stein*, No. 3:08-CV-1731 (CFD), 2009 WL 1407064 (D. Conn. May 18, 2009)).

Courts consider a number of relevant factors when assessing whether a defendant has transacted business under subsection (a)(1), to include:

> (i) whether the defendant has an on-going contractual relationship with a [Connecticut] corporation, (ii) whether the contract was negotiated or executed in [Connecticut] and whether, after executing a contract with a [Connecticut] business, the defendant visited [Connecticut] for the purpose of meeting with parties to the contract regarding the relationship, (iii) what the choice-of-law clause is in any such contract, and (iv) whether the contract requires [the defendants] to send notices and payments into the forum state or subjects them to supervision by the corporation in the forum state.

*HSQD*, 2012 WL 2088698, at *3 (quoting, *inter alia*, *Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25, 29 (2d Cir. 1996) (quotation marks omitted)); *accord NovaFund Advisors, LLC v. Capitala Grp., LLC*, No. 3:18-CV-1023 (MPS), 2019 WL 1173019, at *6 (D. Conn. Mar. 13, 2019) (citing same factors).

10

In addition to requiring that the nonresident individual have transacted business in the state, Section 52-59b(a)(1) embodies a second requirement—that the cause of action have "arisen" from the defendant's business activity in Connecticut.  *See Ryan*, 282 Conn. at 121–22.  "In determining whether the [plaintiff's] cause of action arose from the defendants' transaction of business within this state [courts] do not resort to a rigid formula.  Rather, [they] balance considerations of public policy, common sense, and the chronology and geography of the relevant factors."  *Id.* at 122 (quoting *Zartolas v. Nisenfeld*, 184 Conn. 471, 477, 440 A.2d 179 (1981)).

Callahan represents that he performed all of his contractual obligations for the Company from his Connecticut home (Callahan Aff #1 ¶ 12, ECF No. 20-1), and thus submits that Wisdom transacted business in Connecticut by engaging Callahan in Connecticut to develop the Company's global business.  Defendants respond generally that Callahan's provision of consulting services to Wisdom & Sons cannot satisfy the "purposeful transaction" test under Section 52–59b(a)(1) because it was Callahan's company, Playbook Group LLC, and not Callahan himself that was a party to that transaction.  They further argue that this lawsuit does not even arise from that consulting relationship but, rather, from a purported oral agreement that Wisdom would give Callahan an equity interest in the Company.  From this, they argue that Callahan cannot show a single purposeful transaction because he cannot prove that Wisdom ever promised Callahan such an equity interest.  (*See* Defs.' Mem. at 9–10, ECF No. 33-1.)

While it is true that the purposeful transaction must give rise to the cause of action in order to satisfy the long-arm statute, *see, e.g.*, *Confectionary Arts*, 2018 WL 1141357, at *5, the Court does not agree that the overall consulting arrangement between Wisdom and Callahan, even if through Callahan's LLC, is so far attenuated from the cause of action that jurisdiction can *only* lie if the Court concludes that the parties agreed to a more specific agreement that Callahan would

11

receive an equity interest in Wisdom & Sons. Indeed, as Judge Eginton aptly observed in the Ruling, "the genesis of plaintiff's cause of action based on his alleged equity stake is Mr. Wisdom's contacting him in Connecticut to engage plaintiff's consulting services to enhance his corporation's global operations." (Ruling at 8.) Thus, if the Court determines that Wisdom transacted business in Connecticut within the meaning of the long-arm statute by engaging Callahan as a consultant, and if the Court were to further find that Callahan's claims "arose" from that consulting relationship, then the Court could exercise personal jurisdiction over Wisdom.

Even on this broader jurisdictional runway, however, the Court concludes that Callahan has not established that Wisdom transacted business in Connecticut as required under Conn. Gen. Stat. § 52-59b(a)(1). To establish personal jurisdiction over Wisdom, Callahan relies upon the myriad of ways that Wisdom remained in frequent communication with Callahan and supervised Callahan's consulting work—including, for instance, by approving draft emails and memoranda used in connection with the proposed joint ventures and by providing Callahan with specific goals and directives (*see, e.g.*, Defs.' Ex. C, ECF No. 33-5 at 23, 26, 109, 136, 182, 189)—all while Callahan was working in Connecticut. Callahan also relies upon the history of the parties' collaborations that predated the consulting arrangement. For example, in discussions regarding Praetor Adhesives, Callahan identified Stamford, Connecticut as the company's proposed headquarters in the product and pricing sheets that he drafted and shared with Rolando and Wisdom (*id*. at 159), though he acknowledges that Wisdom responded that they should "use no address." (*Id*. at 150.) Callahan nonetheless argues that Rolando and Wisdom knew that they were engaging Callahan to run a Connecticut-based company in their discussions regarding this venture. (Pl.'s Opp. at 4.)

12

When considered against the relevant factors and standards discussed above, the evidence relied upon by Callahan is insufficient to establish that Wisdom transacted business in the State. First, Wisdom did not have "an on-going contractual relationship" with Callahan or Callahan's Connecticut-based LLC outside of the instant consulting relationship. *See Mortg. Funding Corp. v. Boyer Lake Pointe, LC*, 379 F. Supp. 2d 282, 286–87 (E.D.N.Y. 2005) (finding that the single alleged oral contract on which the dispute was based was not sufficient to give rise to "an on-going contractual relationship" under parallel provision of New York's long arm statute conferring jurisdiction over a non-domiciliary "that 'transacts business within the state'"); *Cont'l Indus. Grp., Inc. v. Equate Petrochemical Co.*, 586 Fed. Appx. 768, 770 (2d Cir. 2014) (summary order) (even assuming an ongoing contractual relationship between the plaintiff and defendant, finding that this factor would not strongly favor jurisdiction under New York's long arm statute where the subject of the contract concerned the distribution of the defendant's products in a foreign market as opposed to in the forum state).[3]  Nor does the evidence suggest that the marketing brochure or history that Callahan generated for the Company, or the parties' discussions regarding the Praetor Adhesives venture, were undertaken pursuant to any kind of ongoing contractual relationship between Callahan and Wisdom.

The second factor also favors Wisdom, as it is undisputed that Wisdom never met Callahan in person in Connecticut for any purpose related to Callahan's services, including to negotiate his compensation (Pl.'s RFA Resp. No. 9, ECF No. 33-3; Pl.'s Interrog. Resp. No. 5), and the consulting contract was negotiated at Wisdom's end from Illinois.  The third factor likewise does not favor jurisdiction and is at best neutral, as the parties' contract was not memorialized in writing

---

[3] "Because 'in enacting § 52–59b, the legislature used New York Civil Practice Law § 302 . . . as a model,' Connecticut courts 'find pertinent the judicial interpretation given to that New York statute." *Evergreen Media Holdings, LLC v. Warren*, 105 F. Supp. 3d 192, 197 (D. Conn. 2015) (quoting *Zartolas*, 184 Conn. at 474).

and there is no choice of law provision that would suggest that they contemplated Connecticut to be a proper forum for resolving their disputes. Fourth, while Wisdom mailed Callahan's payments to Connecticut (Callahan Aff. #1 ¶ 12) he was not otherwise subject "to supervision by [a] corporation in the forum state," *e.g.*, *NovaFund*, 2019 WL 1173019, at *6, and he claims that at the time, he did not know that Playbook Group LLC was a Connecticut corporation. (Wisdom Aff. ¶ 16).

The Court recognizes that some decisions issued in this District ostensibly suggest that the volume of communications between Wisdom and Callahan while Callahan worked in Connecticut during the course of the parties' contractual relationship is sufficient to give rise to Wisdom's transaction of business in the forum. *See HSQD*, 2012 WL 2088698, at *4 (finding personal jurisdiction where parties exchanged more than 400 emails and 360 telephone calls and entered into an oral partnership agreement that "contemplated profit-sharing and ultimate payment of shared proceeds to [the plaintiff company] in Connecticut"); *Caplan*, 2009 WL 1407064, at *1 (finding personal jurisdiction over the defendant following an evidentiary hearing at which the plaintiff testified that the defendant "placed between 50 and 100 telephone calls into Connecticut, using [the plaintiff's] Connecticut cellphone number, and emailed [the plaintiff] in Connecticut between 50 and 100 times over a long period of time," and where the calls included telephone meetings with a Connecticut company that the defendant used to secure financing). The Court is mindful, however, that its inquiry must focus on the "nature and quality" of Wisdom's contacts with the forum, *Confectionary Arts*, 2018 WL 1141357, at *4, and, with respect to the consulting arrangement, the fact that Callahan was located in Connecticut appears to have had no bearing on, or relationship to, the stated purpose of the arrangement—expanding the Company's global business. Callahan's location was purely incidental. *See Century Metal Recycling Private Ltd. v.*

*Metal Worldwide, Inc.*, No. 3:11-CV-1072 (JBA), 2012 WL 13013637, at \*7 (D. Conn. Aug. 2, 2012) (finding that where the defendant's "purpose was to conduct business with Plaintiff, an India-based company that happens to have an office in Connecticut, and his communications with Mr. Kaushal [the plaintiff's corporate officer] to discuss this business occurred wherever Mr. Kaushal was, whether in Connecticut or elsewhere, [these communications] are insufficient to support long–arm jurisdiction over [the individual defendant] under this subsection").

Indeed, in a case involving a similar working arrangement between a Massachusetts consultant and a California-based company, the United States District Court for the District of Massachusetts held that it lacked personal jurisdiction over the company under the "transacts business" prong of Massachusetts's long-arm statute.[4] *See Aub v. Technicolor Entm't Servs.*, 224 F. Supp. 2d 371, 374 (D. Mass. 2002). The court reasoned:

> Technicolor's reasons for hiring Aub as its consultant had nothing to do with her location in Massachusetts. Her services were not localized to Massachusetts, and it was of no consequence to Technicolor that Aub performed any of her work on Technicolor's behalf in this Commonwealth. Rather, it appears that she was hired because of her experience in the entertainment business generally, wherever conducted, and in particular because of her ability to make a connection between Technicolor and Loews, a New York-based company. The fact that there were long-distance communications between the parties by mail and telephone is not enough to justify the conclusion that Technicolor transacted business *in* Massachusetts.

*Id.* The Court finds this reasoning both applicable and persuasive, as it accords with the requirement under Connecticut law that the defendant have engaged in "purposeful Connecticut related activity" by which he "invoked the benefits and protection of Connecticut's laws." *Ryan*, 282 Conn. at 120 (quoting *Zartolas*, 184 Conn. at 475). The record is devoid of any evidence that Wisdom sought such benefits and protection merely by engaging his lifelong friend in Connecticut

---

[4] The relevant part of that statute provides that "[a] court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's (a) transacting any business in this commonwealth . . . ." Mass. Gen. Laws Ch. 223A, § 3(a).

as a consultant for his Illinois company.  *Cf. Winner v. Tryko Partners, LLC*, 333 F. Supp. 3d 250, 260 (W.D.N.Y. 2018) (finding that defendant transacted business under New York's long-arm statute by hiring the plaintiff employee pursuant to a contract that expressly contemplated that she would work from home in New York, where the allegations demonstrated that one of the purposes of the employment relationship was to further the defendant's business and connections in New York).   Here, moreover, it was Callahan that traveled to Illinois—and not Wisdom to Connecticut—when it came time to conduct in-person Company business.[5]   (*See* Pl.'s Interrog. Resp. Nos. 4, 14.)

While Callahan cites *Agency Rent A Car*, 98 F.3d at 31, a case in which the Second Circuit found personal jurisdiction under a similar provision of New York's long-arm statute based on the defendants' frequent interactions with the plaintiff in New York despite the defendants' lack of physical travel to the forum, the case is readily distinguishable.   There, the defendants were licensees of AVIS, the plaintiff, who operated vehicle rental businesses under the AVIS name in various states.   The Second Circuit aptly noted that the defendants' "very businesses arise out of an ongoing contractual relationship with [plaintiff]," and involved near-daily contact with plaintiff's corporate headquarters in New York.  *Id.* at 30.   In finding personal jurisdiction under New York's long-arm statute, the court found that "[t]he [defendants'] contacts with New York have been, . . . anything but temporary, random, or tenuous," and instead were "continual, repetitive, and essential to the [defendants'] businesses."  *Id.*   The same cannot be said of Wisdom,

---

[5] The fact that Wisdom provided Callahan with a Wisdom & Sons email address that listed the Company's Illinois headquarters and contact information in its signature line, moreover, suggests that Wisdom perceived Callahan as holding himself out as part of the Company's Illinois management team as opposed to representing a separate Connecticut-based component.   (*See, e.g.*, email from Callahan to a prospective customer in India in which he introduces himself as "Vice Chairman of Wisdom Adhesives Worldwide . . . established in 1875 – with Headquarters in Chicago, IL and facilities throughout the Globe," ECF No. 33-5 at 132.)  *Cf. Cossart v. United Excel Corp.*, 804 F.3d 13, 18 (1st Cir. 2015) (finding that a Kansas defendant transacted business within the meaning of Massachusetts's long arm statute where the defendant hired and retained a Massachusetts resident as an employee and, *inter alia*, "registered a sales office with the Commonwealth in order to facilitate his work for the company").

whose business did not arise out of his relationship with Callahan and who was not required to be in touch with Callahan in Connecticut in order to maintain his daily operations.

In sum, "balanc[ing] considerations of public policy, common sense, and the chronology and geography of the relevant factors," *Ryan*, 282 Conn. at 122, the Court concludes that Wisdom did not transact business in Connecticut within the meaning of Conn. Gen. Stat. § 52-59b(a)(1) when he entered into the consulting arrangement with Callahan and the Court therefore lacks personal jurisdiction over Wisdom.[6]

**Long-Arm Jurisdiction Over the Company**

As relevant here, Connecticut's long-arm statute provides:

Every foreign corporation shall be subject to suit in this state, by a resident of this state or by a person having a usual place of business in this state, whether or not such foreign corporation is transacting or has transacted business in this state and whether or not it is engaged exclusively in interstate or foreign commerce, on any cause of action arising as follows: (1) Out of any contract made in this state or to be performed in this state; (2) out of any business solicited in this state by mail or otherwise if the corporation has repeatedly so solicited business, whether the orders or offers relating thereto were accepted within or without the state . . .

Conn. Gen. Stat. § 33-929(f).[7]

With respect to subsection (f)(1), Callahan does not contend that the consulting contract was "made" in Connecticut and so the only question is whether the contract was "to be performed"

---

[6] In his brief Callahan reincorporates an argument from his original opposition to Defendants' first motion to dismiss in which he urged the Court to pierce the corporate veil and hold Wisdom liable for the acts of the Company because the Company is "the mere instrumentality or alter ego of Wisdom who controlled the Company to benefit himself personally." (Pl.'s Opp. at 1 n.1; *see also* Pl.'s Original Opp. at 9–11, ECF No. 20.) The Court finds such an issue inappropriate for resolution at this stage given the persistence of disputed facts that would bear on whether or not the Company served as Wisdom's alter ego. Moreover, the Court need not resolve the issue given its ultimate conclusion that personal jurisdiction is lacking over both Defendants, as discussed, *infra*.

[7] While the Court's prior ruling found that Callahan had stated a *prima facie* case of jurisdiction under either subsection (f)(1) or (f)(2), the Court does not address subsection (f)(2), having concluded that personal jurisdiction lies under subsection (f)(1), as discussed, *infra*. The Court finds the "solicitation" prong of the long-arm statute under subsection (f)(2) inapposite in any event, as even if the Company "solicited" Callahan's services, they did not solicit his business as a customer, the latter being the relevant touchstone. *See West World Media*, 809 F. Supp. at 30 ("[W]here the defendant's activities do not specifically target Connecticut consumers, 'there can be no purposeful availment of the laws of the State of Connecticut, and therefore long-arm jurisdiction cannot be proper'") (quoting *Am. Wholesalers Underwriting, Ltd. v. Am. Wholesale Ins. Grp., Inc.*, 312 F. Supp. 2d 247, 257 (D. Conn. 2004))).

in the forum. The Connecticut Supreme Court takes an expansive view of the phrase "to be performed" as used in § 33–929 (f)(1). It recently held that the phrase "refers to the performance that the parties contemplated in the contract, without regard to whether" performance actually occurred. *Samelko v. Kingstone Ins. Co.*, 329 Conn. 249, 258, 184 A.3d 741 (2018). Further, performance by **either** party to the contract can suffice to satisfy Section (f)(1). *Id.* at 259.

> Whether the contract contemplates performance in Connecticut turns on the totality of contacts which [a party to the contract] obligates itself to have, or contemplates that it will have, in this forum on the basis of the agreed upon performance in the contract. This requires a fact specific, case-by-case examination of the obligations that the contract contemplates. The outer boundaries of what qualifies as a contemplated performance are broad. In fact, . . . the contemplation of *incidental* acts of performance of contracts in [Connecticut] [can] come within [the long-arm] statute when the defendant also has other significant contacts with this forum.

*Id.* at 260–61 (quotation marks and citations omitted).

Some Courts in this District have held that to establish personal jurisdiction under this provision premised solely on the Plaintiff's performance, the Plaintiff "must show that either: (1) the contract expressly contemplated or required performance in Connecticut; or (2) the Plaintiff actually performed [his] obligations in Connecticut and such performance was the most substantial part of the obligations to be performed under the contract." *Preferred Display, Inc. v. Vincent Longo, Inc.*, 642 F. Supp. 2d 98, 103 (D. Conn. 2009). The Court questions the continuing viability of relying on the forum in which the plaintiff "actually performed" the contract as an alternative to identifying the forum in which the parties contemplated performance in light of the *Samelko* decision and its emphasis on contemplated performance as the relevant inquiry. The Court need not resolve the possible tension between this standard and *Samelko*, however, because whether this standard remains good law does not change the outcome of this decision.

The Court concludes that Callahan has established a factually supported case of personal jurisdiction over the Company based on the evidence that at the time the parties entered into the

18

contract, it was understood and expected that Callahan would perform the majority of his obligations thereunder from his home in Connecticut.  The Defendants admit that Wisdom knew Callahan lived in Connecticut when the Company hired him and permitted him to work remotely thereafter.  (Wisdom RFA Resp. Nos. 10, 13, ECF No. 34-3; Wisdom Aff. ¶ 12).  The bulk of the customer development work that Callahan undertook for the Company, he undertook from Connecticut.  (*See* Callahan Aff. #1 ¶ 15.)  The Company's denial that Wisdom and other Company personnel communicated with Callahan in Connecticut and its denial and/or refusal to respond to the notion that Callahan performed his obligations to the Company from Connecticut (*see, e.g.*, Wisdom RFA Resp. Nos. 6, 9, 12; Wisdom & Sons RFA Resp. Nos. 4, 6, 9, 12, ECF No. 34-4) is disingenuous posturing.  And this posturing, which presumably relies to some extent upon the distinction between Callahan and Playbook Group LLC but more generally upon the Defendants' refusal to countenance the merits of Callahan's claims, does not rebut the Court's conclusion that the parties contemplated that Callahan would perform his obligations under the contract in Connecticut.

Indeed, perhaps the best evidence of the parties' contemplation is the evidence that Callahan, in fact, performed a substantial portion of his obligations from his home in Connecticut. According to Callahan:

> [T]he early months of my tenure at the Company involved me, independently and alone at my home in Connecticut, scouring outside sources for names of foreign companies in the adhesives business and cold calling them.  Through this months-long process of trial and error, I painstakingly constructed from scratch a database of reliable leads for potential customers worldwide.  Out of my home in Connecticut, I doggedly pursued these leads and developed relationships principally through repeated contact, communication, and attention.  Using whatever skill, experience, and effort I had—which, other than visits to these foreign businesses, was exerted in Connecticut—my work and the relationships I developed generated multi-fold growth in Wisdom Adhesives' global business.

(Callahan Aff. #1 ¶ 15.)  Callahan also cites numerous instances in which Wisdom and Callahan exchanged emails regarding work that Callahan represents was generated from his Connecticut home.  By way of example: Wisdom responded "looks great" in response to a spreadsheet that Callahan created and shared with Wisdom on November 4, 2013 "to keep track of potential international partners" (ECF No. 33-5 at 28); between November 5, 2013 and November 11, 2013, the parties exchanged several emails regarding Callahan's engagement with a potential customer located in India—which again, Callahan represents that he solicited from Connecticut (*id*. at 132–139); and on November 8, 2013, Wisdom sent an email to Callahan that stated, "KC need orders," (*id*. at 23), which Callahan characterizes as a "blunt prompting for Callahan to achieve more business from overseas customers."  (Pl.'s Opp. at 8.)  As noted above, to carry his burden of demonstrating personal jurisdiction, Callahan need only set forth evidence that would establish jurisdiction if credited by the fact finder.  *Dorchester*, 722 F.3d at 85.  He has done so.

Although Callahan has established that the claims arise out of a contract "to be performed" in Connecticut, as that phrase has been interpreted by the Connecticut Supreme Court, Callahan must also establish that the exercise of personal jurisdiction over the Company comports with due process.

### Constitutional Due Process - Specific Jurisdiction

For the Court's exercise of personal jurisdiction to satisfy due process, the non-resident must have sufficient "minimum contacts" with the forum state "such that maintenance of the suit 'does not offend traditional notions of fair play and substantial justice.'"  *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291–92 (1980) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)) (internal quotation marks omitted).  "[T]he requisite 'minimum contacts' must be such that Defendant can 'reasonably anticipate' being haled into court in the forum state—

importantly, 'it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *Vertrue Inc.*, 429 F. Supp. 2d at 495 (quoting *Hanson v. Denckla,* 357 U.S. 235, 253 (1958)).  The Supreme Court has described two related aspects of the minimum contacts inquiry: "First, the relationship must arise out of contacts that the 'defendant *himself*' creates with the forum State." *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).  "Second, [the] 'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Id*. at 285.

"If a defendant has sufficient minimum contacts . . . [the Court] must also determine whether the exercise of personal jurisdiction is reasonable under the Due Process Clause." *MacDermid, Inc. v. Deiter*, 702 F.3d 725, 730 (2d Cir. 2012).

> The Supreme Court and [this] Court consider five factors for determining whether an exercise of jurisdiction is reasonable:
>
> A court must consider [1] the burden on the defendant, [2] the interests of the forum State, and [3] the plaintiff's interest in obtaining relief. It must also weigh in its determination [4] the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and [5] the shared interest of the several States in furthering fundamental substantive social policies.

*Id.* at 730–31 (quoting *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 173 (2d Cir. 2010) (quoting *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 113 (1987))).

The Court notes as an initial matter that while the Company's domestic target customer list includes some Connecticut customers (*see* ECF No. 33-5 at 48), Callahan was not tasked with soliciting or engaging with these customers.  In fact he acknowledges that "Defendants had continuous and regular business with customers in Connecticut separate and apart from their extensive dealings with Callahan in Connecticut."  (Pl.'s Opp. at 13.)  Because they are unrelated

to the instant suit, these forum contacts do not factor into the Court's minimum contacts analysis as it bears on the question of specific personal jurisdiction. *See, e.g.*, *Commodity Futures Trading Comm'n v. TFS-ICAP, LLC*, 415 F. Supp. 3d 371, 382 (S.D.N.Y. 2019) ("The guiding principle of this test is whether the suit arises out of or relates to the defendant's contacts with the forum") (quotation marks and citation omitted).[8]

In addition, "the plaintiff cannot be the only link between the defendant and the forum." *Walden*, 571 U.S. at 285; *see also H. Lewis Packaging, LLC v. Spectrum Plastics, Inc.*, 296 F. Supp. 2d 234, 239 (D. Conn. 2003) ("It is without question that the mere fact that defendant enters into a contract with plaintiff will not, in and of itself, establish personal jurisdiction."). Rather, when a contract with the plaintiff is the asserted basis for personal jurisdiction, "[i]t is these factors—prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing—that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum." *Burger King*, 471 U.S. at 479.

Here, the parties' course of dealing with respect to the consulting arrangement and Callahan's responsibility for developing the Company's global business belies any act or intent on the part of the Company to benefit from an ongoing relationship in and/or specific to Connecticut. To the contrary, the Company's Connecticut-based contacts as they related to the instant dispute begin and end with Callahan, which cannot be the basis upon which due process is satisfied.

---

[8] While Callahan devotes a fair amount of space to the Company's Connecticut customers, he does not contend that the Company's Connecticut contacts are so pervasive as to present the "truly exceptional case" that would render it subject to general personal jurisdiction in Connecticut—a proposition explicitly foreclosed by Judge Eginton's prior ruling (Ruling at 13) and virtually foreclosed, in any event, by Supreme Court precedent. *See Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 627 (2d Cir. 2016) (explaining that the Supreme Court's decision in "*Daimler* established that, except in a truly 'exceptional' case, a corporate defendant may be treated as 'essentially at home' only where it is incorporated or maintains its principal place of business—the 'paradigm' cases.") (citing *Daimler AG v. Bauman*, 571 U.S. 117 (2014)).

*Walden*, 571 U.S. at 285.  Indeed, it is only where the contractual relationship at issue results in a more robust relationship with the forum state that due process will be satisfied.  *See, e.g.*, *Burger King*, 471 U.S. at 480 (finding minimum contacts test met where the defendant "entered into a carefully structured 20-year relationship that envisioned continuing and wide-reaching contacts with Burger King in Florida"); *H. Lewis Packaging*, 296 F. Supp. 2d at 239–40 (finding minimum contacts met where "Defendant sent payments to plaintiff in Connecticut, printed business cards identifying plaintiff's [Connecticut] office as its regional office, met with plaintiff's agent in Connecticut and entered into an agreement with a company incorporated in Connecticut . . . The continuing course of conduct, including telephone calls, commission payments, and affiliation with the forum through business cards, in the aggregate suffices to provide defendant with fair warning that acts or omissions may require it to defend[] a lawsuit in Connecticut").

In sum, the evidence fails to demonstrate that the Company purposefully availed itself of the privilege of conducting business in Connecticut such that it might reasonably anticipate being haled into court in Connecticut merely by engaging a consultant, who, purely incidental to his work for the Company, was located in Connecticut.  Because the Court concludes that minimum contacts are lacking, it need not determine whether exercising personal jurisdiction over the Company would satisfy the Fourteenth Amendment's "reasonableness" requirement.

**Venue**

Although venue may be proper in this District, *see* 28 U.S.C. § 1391(b)(2) (venue is proper in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred"), because the Court lacks personal jurisdiction over both Defendants, it must decide whether to transfer the action to the Northern District of Illinois, *see, e.g.*, *SongByrd, Inc. v. Estate of Grossman*, 206 F.3d 172, 179 n.9 (2d Cir. 2000) (explaining Second Circuit precedent that

"whether or not venue was proper, lack of personal jurisdiction could be cured by transfer to a district in which personal jurisdiction could be exercised, with the transfer authority derived from either section 1406(a) or section 1404(a)."). Section 1406, applicable here, provides that "[t]he district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought."  28 U.S.C. § 1406(a).[9]  This case "could have been brought" in the United States District Court for the Northern District of Illinois, where both Defendants reside, and where, accordingly, the District Court has personal jurisdiction and venue is proper.  *See* 28 U.S.C. § 1391(b)(1) (Venue is proper in "a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located.").

"Courts enjoy considerable discretion in deciding whether to transfer a case in the interest of justice." *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 435 (2d Cir. 2005).  While courts should "not waste judicial resources by transferring a case that is clearly doomed," *id.* at 436 (quotation marks and citation omitted), the merits of this case have yet to be litigated.  Indeed, despite the rather extensive history of this litigation, it remains in a relatively nascent procedural posture.  The question of personal jurisdiction was complicated enough to warrant jurisdictional discovery and two adjudications by the Court.  Thus, there is little to suggest that Callahan was not diligent in selecting Connecticut as a proper forum.  *See Spar*, 956 F.2d at 394 (concluding that transfer "would not be in the interest of justice" if it "would reward plaintiffs for their lack of

---

[9] While some courts and commentators have concluded that "[a] prerequisite to invoking Section 1406(a) is that the venue chosen by the plaintiff is improper," 14D Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. § 3827 (4th ed. 2019), the Second Circuit has interpreted Section 1406 as an available transfer authority where the Court lacks personal jurisdiction over the defendant but venue is otherwise proper.  *See, e.g.*, *Spar, Inc. v. Info. Res., Inc.*, 956 F.2d 392, 394 (2d Cir. 1992) (explaining that "[d]espite the section's language suggesting that a § 1406 transfer should be made only if venue is laid in the wrong district, courts have read § 1406 broadly to allow transfers from districts in which venue was properly laid," including where "the transfer has enabled the parties to surmount an obstacle, such as lack of jurisdiction, which would have precluded suit in the transferor district.").

diligence in choosing a proper forum"). Nor would litigating in the Northern District of Illinois unduly prejudice the Defendants when it is the District in which they are domiciled. *See, e.g.*, *U.S. ex rel. Smith v. Yale Univ.*, No. 3:02-CV-1205 (PCD), 2006 WL 1168446, at *3 (D. Conn. Apr. 28, 2006) (concluding that "transfer would work no hardship on Defendants' ability to defend against the claim on the merits" when they "are both New York entities and presumably will find it easier to defend a suit in New York than in Connecticut."). While Callahan urged the Court at oral argument to countenance his choice of forum, his preference is not entitled to deference where, as here, the Court lacks personal jurisdiction over the Defendants.

**Conclusion**

For the foregoing reasons, Defendants' motion to dismiss is GRANTED and this action is transferred to the United States District Court for the Northern District of Illinois pursuant to 28 U.S.C. § 1406(a). The Clerk of the Court is directed to effectuate the transfer.

**SO ORDERED** at Bridgeport, Connecticut, this 29th day of April 2020.


*/s/ Kari A. Dooley*
KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE